The TRAVELERS INDEMNITY COMPANY, a corporation, and Hartford Accident and Indemnity Company, a corporation, (additional party plaintiff), Plaintiffs,

v.

AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, a corporation, J. Jackson Amick, Dale F. Spaur, Ollie Marie Smith, Dorrence M. Rowe and Robert W. Rowe, Jr., Defendants.

Civ. A. No. 2321.

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 7, 1964.

Walter C. Price, Jr., Payne, Minor, Ray, Price & Loeb, Charleston, W. Va., for plaintiff, The Travelers Indemnity Co.

Edward H. Tiley, Kay, Casto & Chaney, Charleston, W. Va., for plaintiff, Hartford Accident and Indemnity Co.

Edward W. Eardley, Steptoe & Johnson, Charleston, W. Va., for defendant, American Cas. Co. of Reading, Pennsylvania.

John J. Lane, Lane & Preiser, Charleston, W. Va., for defendant, Ollie Marie Smith.

FIELD, Chief Judge.

In this declaratory judgment action three insurance companies seek a determination of their respective obligations under certain automobile liability policies issued by them. The companies here involved are The Travelers Indemnity Company (hereinafter referred to as "Travelers"), Hartford Accident and Indemnity Company (hereinafter referred to as "Hartford"), and American Casualty Company of Reading, Pennsylvania (hereinafter referred to as "American").

Some of the facts were stipulated by the attorneys of record herein, and in addition to the stipulation, certain testimony was taken in open court.

*Stipulation of Facts*

**I**

On October 31, 1958, a 1956 Chevrolet convertible automobile driven by Dale F. Spaur collided with a vehicle owned and operated by Ollie Marie Smith on U.S. Route No. 60 in Kanawha County, West Virginia. Ollie Marie Smith instituted an action against Dale F. Spaur in the Court of Common Pleas of Kanawha

County, West Virginia, seeking damages in the amount of $75,000.00 for alleged personal injuries and property damage resulting from this accident. This action was instituted on January 13, 1959. On October 5, 1960, the defendant not appearing, a writ of inquiry was held in the Court of Common Pleas resulting in a verdict against the defendant in the amount of $20,685.43. A final judgment on this verdict was entered on October 7, 1960, in favor of Ollie Marie Smith against Dale F. Spaur with interest at the rate of 6% per annum from October 5, 1960, and costs in the amount of $36.00.

## II

The 1956 Chevrolet convertible automobile driven by Spaur at the time of the accident with Ollie Marie Smith was titled in the name of Dorrence M. Rowe, 905 Vincent Street, Charleston, West Virginia. On or about October 1, 1955, defendant American had issued its automobile Policy No. T360695 to Dorrence M. Rowe, effective for a period of one year, insuring a 1955 Chevrolet two-door Bel Air automobile. By an endorsement dated February 4, 1956, the subject 1956 Chevrolet convertible was substituted in the place and stead of the Chevrolet Bel Air as the insured vehicle under this policy. On October 1, 1956, American renewed this policy by issuing to Dorrence M. Rowe its Policy No. T622235, which policy was effective for a period of one year from date. On June 14, 1957, American cancelled this policy and issued to Dorrence M. Rowe its Policy No. FA10 2300 which policy carried an effective period of one year from the date of issuance. On June 14, 1958, American issued its Policy No. F–7–2985 to Dorrence M. Rowe effective for a period of one year to June 14, 1959, insuring the 1956 Chevrolet convertible automobile.

The last mentioned Policy No. F–7–2985 provides:

"Persons Insured—The following are insureds under Part 1:

"(a) With respect to the owned automobile,

(1) the named insured and any resident of the same household,

(2) any other person using such automobile provided the actual use thereof is with the permission of the named insured;

\* \* \* \* \* \*

"Definitions—Under Part 1:

" 'named insured' means the individual named in Item 1 of the declarations and also includes his spouse, if a resident of the same household;

" 'insured' means a person or organization described under 'Persons Insured';

" 'relative' means a relative of the named insured who is a resident of the same household;"

## III

On or about July 15, 1958, Travelers had issued to J. Jackson Amick a Family Automobile Policy No. MP–4942588, effective for a period of one year to July 15, 1959, covering a 1954 Chevrolet two-door sedan. Under the provisions of this policy a person insured with respect to a nonowned automobile is defined as (1) the named insured, and (2) any relative, but only with respect to a private passenger automobile or trailer, provided the actual use thereof is with the permission of the owner. The word "relative" is defined in the policy as a relative of the named insured who is a resident of the same household.

## IV

On July 18, 1958, Hartford had issued its automobile Policy No. HK–781159 to J. J. and Mary Frances Amick d. b. a. Speedway Motel, covering a 1957 Mercury two-door sedan, which policy of insurance was effective for a period of one year to July 18, 1959. The provisions of this policy define an insured as the named insured and his spouse if a resident of the same household, and also includes any person while using the automobile provided the actual use of the automobile is by the named insured or his spouse or with the permission of either of those

two. The "automobile" includes a temporary substitute automobile. The definition of a temporary substitute automobile is as follows:

"(3) TEMPORARY SUBSTITUTE AUTOMOBILE—under coverages A, B-1 and C, an automobile not owned by the named insured or his spouse if a resident of the same household, while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;"

## V

American was promptly notified of the occurrence of the accident of October 31, 1958, and after an investigation of all the facts and circumstances, on May 14, 1959, American issued letters of cancellation to both Dorrence M. Rowe and Dale F. Spaur, copies of these letters also being forwarded to the local claims superintendent of Hartford. Hartford was notified of the accident on November 28, 1958, and began its investigation thereof on December 23, 1958.

Neither Amick nor Spaur notified Travelers of the accident of October 31, 1958, nor the institution of the action by Ollie Marie Smith on January 13, 1959. Neither Amick, his wife, nor Spaur notified Hartford of the accident of October 31, 1958, or the institution of the action by Smith on January 13, 1959. Neither Dorrence M. Rowe, Robert W. Rowe, nor Dale F. Spaur notified American of the institution of the action by Smith on January 13, 1959.

## VI

On June 9, 1959, counsel for American discovered the pending action of Smith against Spaur on the docket of the Court of Common Pleas of Kanawha County, and on June 10, 1959, they advised the local claims manager of American of the pending action by letter, copies of which letter together with copies of the declaration in the pending litigation were sent to the local claims representatives of both Hartford and Travelers. Thereafter Travelers entered into an agreement with Spaur, dated June 22, 1959, under which Travelers conducted an investigation of the accident without prejudice to the rights of either party under its policy of insurance. On July 1, 1959, Travelers notified Spaur that it denied coverage to him under this policy and sent a copy thereof to J. Jackson Amick.

## VII

On June 14, 1955, American had issued its automobile Policy No. T2 6-0707 to Dorrence M. Rowe, insuring a 1953 Oldsmobile automobile which policy was in effect for a period of one year until June 14, 1956, and on this latter date American renewed this policy to Dorrence M. Rowe by issuing its Policy No. T 51-4965, insuring a 1956 Oldsmobile which policy was in effect for a period of one year until June 14, 1957. Both of these policies contained an endorsement relative to the use of other automobiles extending coverage under such endorsement to Robert W. Rowe, Jr., for an additional premium charge of $5.08. On June 14, 1957, American issued to Dorrence M. Rowe a Family Automobile Policy No. FA10 2325 insuring the 1956 Oldsmobile automobile for a period of one year until June 14, 1958. On June 14, 1958, American issued to Dorrence M. Rowe a Family Automobile Policy No. F7-2984 insuring the 1956 Oldsmobile automobile which policy was in effect for a period of one year until June 14, 1959. This policy did not contain the endorsement which had been placed on the prior policies.

Prior to the issuance of any policy to Dorrence M. Rowe, American obtained a credit report on Dorrence M. Rowe from Retail Credit Company dated June 23, 1955. This credit report contained information as to drivers, stating that the wife of Dorrence M. Rowe was a good driver and well regarded and that his brother, Robert, age 29, had his own car at that time. American never obtained a credit report on Robert W. Rowe, Jr.

*Findings of Fact*

From the testimony taken in open court I find the facts in addition to those stipulated to be as follows:

At the time of the accident Robert W. Rowe, Jr., was living at the Speedway Motel in St. Albans, West Virginia, having been employed and lived there since June 14, 1958. The Motel was owned and operated by J. Jackson Amick and his wife, and Dale Spaur, who is the stepson of Amick, lived with his mother and stepfather at the Motel. At that time Robert Rowe, Jr., had possession of the 1956 Chevrolet convertible which was titled in the name of Dorrence Rowe, and was keeping it at the Motel. The 1954 Chevrolet sedan covered by the Travelers policy and owned by J. Jackson Amick was also kept at the Motel.

The 1957 Mercury sedan which was covered by the Hartford policy had been purchased by J. J. and Mary Frances Amick from Kanawha City Motors. It was purchased under a conditional sales contract covering a deferred purchase note in the amount of $2400.00 which note was assigned with recourse to Kanawha City Savings and Loan Company. The first monthly payment in the amount of $80.00 was made on this note on July 18, 1958. The purchasers were thereafter in default, and sometime prior to October 15, 1958, the Mercury was repossessed by Kanawha City Motors and advertised for sale at public auction. At the time the vehicle was repossessed, it was in need of some repairs but was in an operable condition. It was not taken into the possession of Kanawha City Motors for the purpose of making any repairs but for the purpose of repossessing it by reason of the defaults in payments on the conditional sales contract. Kanawha City Motors did not observe the statutory requirements in regard to the repossession and sale of the car under the West Virginia Conditional Sales Act, and, in fact, arrangements were later made in December of 1958 under which the Amicks put their account in order and were again given possession of the 1957 Mercury.

Sometime in the forenoon of October 30, 1958, Robert Rowe, Jr., gave Dale Spaur permission to use the 1956 Chevrolet for the purpose of going to South Charleston to match some wallpaper for Spaur's mother. Robert Rowe, Jr., was confined to his bed on that day because of illness, but he did observe that Spaur brought the automobile back to the Motel on that afternoon. Spaur did not again obtain specific permission from Rowe to use the vehicle that evening. However, the evidence indicates that a mutual understanding had existed between Rowe and Spaur for some time relative to the use of the car, and I find that Spaur's use of the car later that evening was with the express or implied permission of Robert W. Rowe, Jr.

Robert W. Rowe, Jr., is a war veteran and he was admitted to the Veterans Hospital in Chillicothe sometime in January, 1952, for treatment of service incurred injuries and shock. On that occasion Robert remained in the hospital for a period of approximately one year. Also on January 7, 1952, Robert was declared mentally incompetent by the Mental Hygiene Commission of Kanawha County and apparently The Charleston National Bank was appointed as his committee. It further appears that Robert continued in this status as an incompetent until August 13, 1956, when he was declared competent and his committee discharged. A year later, in September, 1957, Robert was again hospitalized for further treatment of his mental condition. However, it does not appear that he was ever again declared mentally incompetent.

Following his initial confinement in the Veterans Hospital, Robert Rowe, Jr., returned to Charleston and resided in the home of his brother Dorrence. At that time Robert was separated from his wife. In February, 1956, Robert bought the 1956 Chevrolet convertible which was the subject of the policy here in question. At that time he traded in as a downpayment a 1955 Chevrolet which he had previously purchased but which had been titled in the name of his brother Dorrence. The 1956 Chevrolet was also titled

in the name of Dorrence. During this same period Robert also bought a 1956 Oldsmobile which was titled in the name of Dorrence, and Robert apparently made a gift of this automobile to his brother. Robert made the payments on the 1956 Chevrolet until he returned to the Veterans Hospital late in that year. While Robert was confined in the hospital Dorrence made the monthly payments, but Robert later repaid him.

In 1957 Robert returned to Charleston from the hospital and resided in the home of Dorrence for two weeks. He then moved to the home of his sister on Ash Street in Charleston. The Chevrolet had been at the home of his brother, but was later moved to the basement of the home of Robert's sister on Ash Street. The vehicle was without a license while Robert was in the hospital and no license was obtained until July, 1958.

It appears that both the 1956 Chevrolet and 1956 Oldsmobile were purchased with money which Robert had received from the Veterans Administration; and while Dorrence considered the 1956 Chevrolet to be Robert's car, nevertheless Dorrence had cautioned Robert against permitting anyone else to drive the car. Dorrence moved into the home of his sister on Ash Street shortly before Robert left there to move to the Speedway Motel, and after Robert moved to the Speedway Motel, Dorrence used the Chevrolet on only a few infrequent occasions. It is clear, of course, that Dorrence never granted permission to Dale Spaur to use the car. The insurance policy covering the 1956 Chevrolet was in the glove compartment of the vehicle, but Robert held no identification card as an insured except that one issued pursuant to the drive-other-car coverage on the 1956 Oldsmobile.

All of the policies in question issued by American were sold to Dorrence Rowe by Kenneth Tucker, an independent insurance agent. Tucker's first contact with Dorrence Rowe was relative to insurance on Rowe's house in Cross Lanes. The first of the insurance policies sold by Tucker to Dorrence Rowe was Policy No. T36 0695 which was issued on October 1, 1955, covering the 1955 Chevrolet Bel Air. As has been stated, this vehicle at that time did, in fact, belong to Robert W. Rowe, Jr. All of the dealings by Tucker with reference to all of the American policies in question were negotiated and carried on between Tucker and Dorrence Rowe. Tucker never met or talked with Robert W. Rowe, Jr., until after the accident in question. The ownership of the vehicles covered by all of the policies sold by Tucker was represented to be in Dorrence Rowe, and Tucker had no reason to suspect that Robert W. Rowe, Jr., was the owner of any of them. Following the accident and the disclosures relative to the ownership of the 1956 Chevrolet, Policy F7 2985 was cancelled *ab initio* by American, and the full premium which had been paid on this policy was tendered to Dorrence Rowe.

An experienced representative of the underwriting division of American testified as to the manner in which the automobile policies were processed and the risks appraised and evaluated by that company. It appears that in each instance during the period in question when an initial policy was issued the company ordered an investigation of the named insured. With respect to those here involved this investigation was made by the Retail Credit Company. No specific report was ever ordered on Robert W. Rowe, Jr., even with respect to the endorsement covering him under the drive-other-car feature of the policies issued on the 1953 and 1956 Oldsmobiles. During the period in question American did not conduct investigations on the various members of a family who might or might not drive the vehicles covered by a particular policy aside from the owner as the named insured. It is true, however, that during the period that Robert W. Rowe, Jr., was covered under the drive-other-car endorsement on the Oldsmobile policy, the records of American necessarily indicated that he did on occasions drive not only the insured vehicle but also, of course, would be covered in his use of other automobiles. If it had been dis-

closed to American that Robert W. Rowe, Jr., was the owner of the 1956 Chevrolet convertible a report would have been requested on him, and had that report reflected information relative to his mental illness or incapacity, American would not have issued a policy covering him; and had one been issued prior to such disclosure, the policy would have been cancelled.

### Conclusions

#### I

■ Coverage under the Hartford policy would exist only in the event its provisions relative to a temporary substitute automobile would be operative in this case. Those provisions would apply if Spaur were driving the 1956 Chevrolet as a temporary substitute for the 1957 Mercury at a time when the latter vehicle had been "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction." Since the evidence showed that the Mercury was withdrawn from normal use not for any of those reasons, but solely as a result of the repossession thereof, the 1956 Chevrolet was not a temporary substitute within the policy terms, and Hartford was dismissed as a defendant at the close of the evidence.

#### II

■ With respect to the position of Travelers in this controversy, I have found that the 1956 Chevrolet was, in fact, owned by Robert W. Rowe, Jr., and at the time of the accident Spaur was driving the vehicle with the express or implied consent of Rowe. Counsel concede that these findings bring Spaur within the definition of an insured under the terms of the Travelers policy. The remaining question is whether Travelers was relieved of its obligations by reason of the failure of the insured to give the company notice of the accident as required by the terms and conditions of the policy.

The policy condition relative to notice requires that written notice of the accident shall be given by or for the insured to the company "as soon as practicable."

It is stipulated that neither the named insured, Amick, nor the additional insured, Spaur, ever gave notice of the accident or litigation to Travelers. The only information received by Travelers was the copy of the letter dated June 10, 1959, from American's attorneys to T. K. Snyder, enclosing the copy of the declaration in the Smith case. Even should we assume, *arguendo*, that this constituted a notice for the insured within the policy provisions, it was given over seven months after the accident.

While the Travelers' policy requires that notice be given "as soon as practicable," the courts generally have held that all such provisions, regardless of phraseology, require that notice be given within a reasonable time under the circumstances. See 18 A.L.R.2d 443, 462. This view was adopted by our West Virginia Court in Black & White Cab Co. v. New York Indemnity Co., 108 W.Va. 93, 150 S.E. 521. In that case notice was given to the insurer some eleven months after the accident, and the Court made this observation:

"Clause D, as hereinbefore quoted, provides that the assured shall give prompt written notice in case of an accident. No definite time being provided for such report, the same must be made within a reasonable time, having regard to all of the circumstances. A delay of three months has been held to be unreasonable. Blashfield on Insurance, vol. 3, p. 2662. Certainly, a year would not be considered a reasonable time, for after such a lapse of time the indemnity company would not be able to secure witnesses with which to properly defend the case. The facts set out in the declaration filed as an exhibit show that the accident was more than a trivial occurrence. So the question of the reasonableness of the notice must be considered in relation to the date of the accident, and not from some future time. Berry on Automobiles, vol. 2, § 2109. The notice here was clearly not given within a reasonable time."

In the recent case of Ragland v. Nationwide Mutual Ins. Co., 120 S.E.2d 482 (W.Va.1961) notice was given to the company's agent by the insured some six months after the accident. The trial court had held that the provision for notice was a condition subsequent, and concluded that the company was liable since it had suffered no actual prejudice as a result of the delay. Judge Browning, after reviewing the authorities, stated (page 485 of 120 S.E.2d):

"It seems clear by the great weight of authority that the delay by the insured from May 8, 1956 to November 3, 1956, in giving notice of the fatal accident was not timely, and the insurer will be relieved of liability by the insured's violation of this condition of the policy, unless the rule be applied that prejudice must be shown to relieve the insurer under such circumstances."

The opinion cites with approval the case of State Farm Mut. Auto. Ins. Co. v. Cassinelli, 67 Nev. 227, 216 P.2d 606, 18 A.L.R.2d 431. In that case the court had said:

"By reason of the overwhelming weight of authority of the courts of last resort within the United States, we are compelled to hold that on account of the respondent's failure to perform the condition precedent, stipulated in the policy as such, of giving notice of the suit and forwarding summons and complaint within a reasonable time, no action on his part lay against the company. Lack of prejudice, under the terms of the policy, was immaterial."

Judge Browning goes on to cite the Black & White Cab. Co. case, supra, and after quoting the language of that opinion to which I have adverted herein, observes:

"* * * It will be observed that in the opinion of that case there is no reference to a 'condition precedent', a 'condition subsequent', 'prejudice' or the absence of it. The decision of this Court in that case has never

been reversed or criticized in any subsequent case. * * * The Black & White Cab Company decision and the views expressed in the opinion are in accord with the weight of authority upon this issue, and particularly the 'modern trend' as evidenced by the recent decisions of courts of other jurisdictions."

In the light of these authorities, I conclude that the inordinate delay or absence of notice to Travelers as required by the policy relieves it of any liability herein, and the question of lack of prejudice being immaterial, it is unnecessary to make a finding on that issue of fact.

### III

Finally, it is necessary to consider the policy issued by American to Dorrence Rowe on the 1956 Chevrolet titled in his name but owned by Robert W. Rowe, Jr. American takes the position that its policy was avoided *ab initio* since it was obtained by the misrepresentation of Dorrence that he was the owner of the vehicle; that such misrepresentation was fraudulent and was material to the acceptance of the risk by the insurer. In 29 Am.Jur. Insurance § 698, a misrepresentation is defined as follows:

"A 'misrepresentation' in insurance is a statement as a fact of something which is untrue, and which the insured states with the knowledge that it is untrue and with an intent to deceive, or which he states positively as true without knowing it to be true, and which has a tendency to mislead, where such fact in either case is material to the risk."

In the context of life insurance the Supreme Court of Appeals of West Virginia stated in the syllabus in Faulkiner v. Equitable Life Insurance Company, 144 W.Va. 193, 107 S.E.2d 360 (1959):

"Where a specific answer is sought by the insurer in an application for an insurance policy, the fact elicited thereby will be treated as a material one; and if such answer, whether it be treated as a representation or

warranty, is untrue, the policy will ordinarily be forfeited."

It is unnecessary in this case to determine whether the effect of this language has been substantially diluted by the enactment in 1957 of Chapter 33, Article 6, Section 7 of the West Virginia Code,[1] for even should I conclude that the misrepresentation as to ownership was not, in fact, fraudulent, nevertheless, the question of the competency of Robert W. Rowe, Jr., the true owner of the insured vehicle, was on its face material to the acceptance of the risk, and the evidence of the witness, Ermantrout, clearly indicates that the insurer would not have issued the policy had it known the true facts in this regard.

█ The present case falls within the principles of the Tenth Circuit decision in Didlake v. Standard Ins. Co., 195 F.2d 247, page 249 (1952), wherein the Court stated:

"Here, the statement as to the ownership of the automobile was an existing fact, susceptible of exact knowledge and correct statement. Lathrop knew it was false when he made it; he intended that Meade and the Insurance Company should rely upon it; they had a right to and did rely upon it, and but for such false representation the policy would not have been issued.

"[1] Under the Oklahoma decisions, in order for a false representation to avoid a policy of insurance it must be material to the risk.

\* \* \* \* \* \*

"When an insurance company issues a policy of automobile liability insurance, providing for coverage of the named insured as owner, and containing an omnibus clause, it intends that the coverage of the named insured shall apply to the person who owns, possesses and controls the automobile, and that the omnibus clause shall apply only to third persons who use the automobile with the owner's and named insured's consent, given by the owner in the exercise of discretion and judgment. It is true that the insurance company, when it issues such a policy, has no knowledge with respect to third persons who may use the automobile with the permission of the owner and named insured, but it is a reasonable assumption that ordinarily the major use of the automobile will be by the owner and the named insured. Hence, it seems to us that the age and driving habits of the owner and named insured and whether he possesses normal mental and physical faculties are facts which should be, and are, considered by an insurance company in determining whether it will assume the risk to be covered by the policy.

"Where the application for the insurance is made by the true owner and he is to be designated in the policy as the named insured, the insurance company, before issuing the policy, may investigate the age and other facts with respect to such owner which it deems important in determining whether to issue the policy, but where the fact with respect to ownership is misrepresented and the identity of the true owner is

---

1. "Representations in Applications.—All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless:
 "(a) Fraudulent; or
 "(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

"(c) The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise. (1957, c. 97.)"

concealed with the purpose of obtaining coverage for the true owner under the omnibus clause, no such opportunity is present."

 It is my opinion that the misrepresentation as to ownership did avoid the policy, and justified American's cancellation *ab initio*. In any event, upon the facts here present, Spaur could obtain no coverage under the terms of American's policy for he could be afforded coverage only while driving the vehicle "provided the use thereof is with the permission of the named insured." In West Virginia, the phrase "named insured" has a restricted meaning and will not apply to persons other than those named in the policy. Farley v. American Automobile Insurance Company, 137 W.Va. 455, 72 S.E.2d 520, 34 A.L.R.2d 933 (1952). Permissive use under the policy terms by either Robert W. Rowe, Jr., or Spaur was impossible of accomplishment since the former was the actual owner of the insured vehicle. Again the language of the Court in the Didlake case is appropriate:

" * * * The rationale of such decisions is that the words 'consent' or 'permission' as used in the omnibus clause connote the power to withhold as well as grant, and since the named insured in the policy could not withhold from the owner in possession and control of the automobile the right to use it, it could not be said that the use by the latter was with the permission and consent of the person to whom the policy was issued.

"Here, the use of the automobile by Jannson at the time of the accident was by virtue of his ownership, possession and control of the automobile. It was not by virtue of permission given by Lathrop, who could not withhold from Jannson the right to use the automobile and therefore could not give his permission for such use.

"Jannson caused Lathrop to represent falsely to the Insurance Company that he was the owner of the automobile to induce the Insurance Company to issue the policy to Lathrop as the owner and named insured. The Insurance Company, believing such representation and relying thereon, was induced to issue the policy to Lathrop. By the omnibus clause it intended to cover, not the owner, but third persons. It plainly did not intend that a concealed owner, who was not a third person, should be covered by the omnibus clause. Therefore, we are of the opinion that no rule of liberal construction warrants the interpretation that Jannson was covered by the omnibus clause."

 The only remaining question is that of the possible estoppel of American by reason of the lapse of time between the date of the accident and the notification of cancellation—a period of some seven months. The defenses of waiver or estoppel were not pleaded in this case, but the question was addressed to counsel by the Court after briefs had been submitted on the primary issues. It is, of course, almost axiomatic that an insurer, seeking to rescind a policy for fraud, must do so within a reasonable time after acquiring knowledge of the facts relied upon for rescission. Commercial Standard Ins. Co. v. Blankenship, 40 F.Supp. 618 (M.D.Tenn.1941); Ellis v. Metropolitan Casualty Ins. Co. of New York, 187 S.C. 162, 197 S.E. 510 (1938). However, American was entitled to a reasonable time to investigate every aspect of this somewhat complex arrangement and there is nothing in the record to indicate the date on which American received the information on which it took action to rescind. Even should the delay be considered unreasonable, the record is silent as to any prejudice resulting from such delay. These vital elements cannot be supplied by inference or conjecture. Hesselberg v. Aetna Life Ins. Co., 75 F.2d 490 (8th Cir. 1935). In that case the Court stated (page 493 of 75 F.2d):

" 'Where an equitable estoppel is relied upon, the facts upon which it

is based must be proved with particularity and precision, and nothing can be supplied by inference or intendment.' Standard Sanitary Mfg. Co. v. Arrott (C.C.A. 8) 135 F. 750."

In the light of the findings and the authorities hereinabove cited, I conclude that American's policy was issued as the result of material misrepresentation, and the insurer was justified in cancelling and avoiding the policy *ab initio*.

Counsel may prepare an appropriate order incorporating this opinion therein by reference as my findings of fact and conclusions of law.